UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                                    :          CASE NO. 22-56997-BEM
                                          :
TERRENCE GRIFFIN and                      :          CHAPTER 7
KIMBERLY GRIFFIN,                         :
                                          :
        Debtors.                          :
                                          :
_____ :

## APPLICATION TO EMPLOY REAL ESTATE BROKER
## UNDER LISTING AGREEMENT

COMES NOW S. Gregory Hays, as Chapter 7 Trustee ("**Trustee**") for the bankruptcy

estates (collectively, the "**Bankruptcy Estate**") of Terrence Griffin and Kimberly Griffin

("**Debtors**"), and moves this Court for an Order authorizing him to employ Humphries & King

Realty and John V. Ball (collectively hereafter referred to as "**Humphries & King**") as listing

broker for the Bankruptcy Estate (the "**Application**"), and respectfully shows this Court as

follows:

1.      Debtors filed a voluntary petition under Chapter 7 of Title 11 of the United States

Code on September 2, 2022 (the "**Petition Date**"), thereby initiating Bankruptcy Case No. 22-

56997-BEM (the "**Case**").

2.      Also on the Petition Date, Debtors filed under penalty of perjury their *Statement of*

*Financial Affairs, Schedules "A"* through *"J,"* (the "**Sworn Schedules**") and *Other Bankruptcy*

*Documents* [Doc. No. 1].

3.      Trustee was appointed to the Bankruptcy Case as interim Chapter 7 Trustee on

September 6, 2022 [Doc. No. 6], pursuant to 11 U.S.C. § 701(a)(1).

02497467-1

4.      The original Chapter 7 meeting of creditors was held telephonically and concluded on October 12, 2022, pursuant to 11 U.S.C. §341(a), after which time, the Trustee became the permanent Chapter 7 trustee pursuant to 11 U.S.C. § 702(d).

5.      At the commencement of the Bankruptcy Case, the Debtors' bankruptcy estates were created under 11 U.S.C. § 541(a) (collectively, the "**Bankruptcy Estate**"), and the Bankruptcy Estate included all Debtors' legal or equitable interests in property as of the commencement of the Bankruptcy Case and any interest in property that the Bankruptcy Estate acquired after commencement of the Bankruptcy Case.  11 U.S.C. § 541(a)(1) and (7).

6.      Trustee is the sole representative of the Bankruptcy Estate.  11 U.S.C. § 323(a).

7.      Trustee is under a duty to collect and reduce to money the property of the Bankruptcy Estate.  11 U.S.C. § 704(a)(1).

8.      On October 27, 2022, Trustee filed his *Application for Appointment of Attorneys* [Doc. No. 14], and on November 2, 2022, an *Order* [Doc. No. 18] was entered by the Court, appointing Taylor English Duma LLP as attorneys for Trustee.

### The Property

9.      In their Sworn Schedules, *Schedule A/B: Property* [Doc. No. 1, page 10 of 62], Debtors scheduled their joint ownership interest in that certain real property known generally as 1895 Milfield Circle, Snellville, Gwinnett County, Georgia 30078 (the "**Property**").

10.      In their Sworn Schedules, *Schedule C: The Property You Claim as Exempt* [Doc. No. 1, page 16 of 62], Debtors scheduled a homestead exemption in the Property in the amount of $23,280.09 pursuant to O.C.G.A. § 44-13-100(a)(1).

02497467-1

**Alleged Liens, Interests, and Encumbrances**

11.     In their Sworn Schedules, *Schedule D: Creditors Who Have Claims Secured by Property* [Doc. No. 1, pages 19-20 of 62], Debtors scheduled two (2) claims on or against the Property: (a) a first mortgage in the amount of $164,518.00 in favor of USAA/Nationstar Mortgage ("**USAA**") and (b) a second mortgage in the amount of $306,395.70 in favor of Renasant.

12.     Trustee's counsel obtained a full title examination report of the Property on October 27, 2022, effective October 20, 2022 (the "**Title Report**"), confirming the security interest of USAA.

13.     The Title Report reflected a second *Deed to Secure Debt and Security Agreement* (the "**Security Deed**"), dated April 17, 2018, and recorded on the real estate records with the Clerk of the Superior Court of Gwinnett County on April 18, 2018, in favor of Renasant, as successor by merger to Brand Banking Company in the original principal amount of $532,000.00.

14.     Renasant filed a secured proof of claim (Claim No. 2) in the amount of $292,386.87, secured by the Security Deed collateralizing a Guaranty on a U.S. Small Business Administration Note.

**Settlement Agreement with Renasant**

15.     Trustee and Renasant entered into a *Joint Stipulation and Settlement* (the "**Settlement Agreement**") whereby Trustee is to proceed with a sale of the Property pursuant to 11 U.S.C. § 363(b) and for the Bankruptcy Estate to receive a Carve-Out from the Net Sale Proceeds whereby the net sale proceeds, as defined hereinbelow, that would otherwise be paid to Renasant, will instead be allocated and paid fifty-five (55%) percent to Renasant and forty-five (45%) percent to the Trustee on behalf of the Bankruptcy Estate (the "**Carve-Out**"), with the allocation and payment made to the Trustee from the Carve-Out reducing dollar for dollar the indebtedness owed Renasant.

02497467-1

16.     On November 30, 2022, Trustee filed a *Motion for an Order Approving the Settlement Agreement Under Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Doc. No. 23] (the "**Settlement Motion**").

17.     On January 10, 2023, the Court entered an *Order* [Doc. No. 29], granting the Settlement Motion and approving the Settlement Agreement.

### Request Authority to Employ Real Estate Broker

18.     Based on a thorough inspection, evaluation, and comparative marketing analysis by a licensed real estate broker, Trustee has determined that the Property should be marketed for sale at a listing price of $520,000.00.  Based on the value of the Property and the Carve-Out, there should be approximately $135,000.00 of net sale proceeds available for the Estate.

19.     Accordingly, Trustee requests authority from the Court to employ Humphries & King as his listing broker in the proposed sale of the Property under a listing agreement effective through and including August 16, 2023 (the "**Listing Agreement**"), which may be extended if necessary, starting at a listing price of $520,000.00, with a six (6%) percent commission of the selling price.  The Listing Agreement is attached hereto, marked as Exhibit "A" and incorporated herein by reference.

20.     Any contract for sale of the Property will be subject to Bankruptcy Court approval following the filing of a motion pursuant to 11 U.S.C. § 363.

21.     The affidavit of John V. Ball regarding the matters set out in this Application is attached hereto as Exhibit "B" and incorporated herein by reference.

22.     Humphries & King does not represent any interest adverse to the Bankruptcy Estate and is a disinterested person as that term is defined in 11 U.S.C. §101(14).  Humphries & King has no current relationship with Debtors, or Trustee other than listing other properties for the Trustee in other bankruptcy cases.

02497467-1

23.    The employment of Humphries & King as the listing broker to sell the Property pursuant to the terms of the Listing Agreement is in the best interest of the Bankruptcy Estate.

WHEREFORE, Trustee prays that this Court (a) grant authority to employ Humphries & King as his listing broker to sell the Property pursuant to the Listing Agreement and (b) such other and further relief as is just and proper.

Respectfully submitted,

TAYLOR ENGLISH DUMA LLP
*Attorneys for Trustee*

By /s/ Neil C. Gordon
     Neil C. Gordon
     Georgia Bar No. 302387

1600 Parkwood Circle, SE
Suite 200
Atlanta, Georgia 30339
Tele: (404) 640-5917
Email: ngordon@taylorenglish.com

EXHIBIT "A" FOLLOWS

# EXCLUSIVE SELLER BROKERAGE ENGAGEMENT AGREEMENT



**2023 Printing**

**State law prohibits Broker from representing Seller as a client without first entering into a written agreement with Seller under O.C.G.A. § 10-6A-1 et. seq.**

## A. KEY TERMS AND CONDITIONS

1. **Exclusive Seller Brokerage Engagement Agreement.** For and in consideration of the mutual promises contained herein and other good and valuable consideration, the undersigned seller(s) ("Seller") and the undersigned broker ("Broker") do hereby enter into this Exclusive Seller Brokerage Engagement Agreement ("Agreement") for Broker to exclusively represent the Seller in listing and selling the property described below ("Property") for sale on the terms and conditions set forth herein.

   a. **Property Identification:** Address: 1895 Milfield Circle

   City Snellville _____, County Gwinnett County _____, Georgia, Zip Code 30078

   Tax Parcel I.D. Number: _____

   b. **Legal Description:** The legal description of the Property is *[select one of the following below]*:

   ☑ (1) attached as an exhibit hereto;

   ☐ (2) the same as described in Deed Book _____, Page ____, et. seq., of the land records of the above county; **OR**

   ☐ (3) Land Lot(s) _____ of the _____ District, _____ Section/

   GMD, Lot _____, Block _____, Unit _____, Phase/Section _____

   of _____ Subdivision/Development, according to

   the plat recorded in Plat Book _____, Page _____, et. seq., of the land records of the above county;

   **OR**

   ☐ (4) described below if Property is a condominium unit and a full unit legal description is to be used

   **[NOT TO BE USED IF PROPERTY IS A FEE SIMPLE TOWNHOME]:**

   Unit _____ of _____ Condominium

   ("Condominium"), located in Land Lot _____ of the _____ District of _____ County, Georgia, together with its percentage of undivided interest in the common elements of the Condominium, and its interest in the limited common elements assigned to the unit ("Unit"). The Condominium was created pursuant to the Declaration of Condominium for any Condominium ("Declaration"), recorded in Deed Book _____, Page _____, et seq., _____ County, Georgia records ("Declaration"), and shown and delineated on the plat of survey filed in Condominium Plat Book _____, Page _____, _____ County, Georgia records, and on the floor plans filed in Condominium Floor Plan Book _____ Page _____, _____ County, Georgia records.

2. **List Price and Listing Period.**

   a. The price at which the Property shall be listed for sale is $520,000 _____ ("List Price").

   b. **Commencement Date of Agreement:** 02/15/2023 _____. This Agreement shall commence and be effective upon it being signed by Seller and Broker and a signed copy delivered to both parties.

   c. **Ending Date of Agreement:** 08/16/2023 _____. This shall be the last full date of the Agreement after which it shall terminate and no longer be in effect unless the parties agree in writing to extend it.

3. **Marketing.** Broker agrees to file this listing with the following Multiple Listing Service(s): FMLS and GAMLS

   a. **DELIVERY OF AGREEMENT TO AND LISTING WITH MLS.** THIS AGREEMENT MUST BE TIMELY DELIVERED TO AND LISTED WITH THE ABOVE-REFERENCED MULTIPLE LISTING SERVICE(S) IN ACCORDANCE WITH THE RULES OF SUCH MULTIPLE LISTING SERVICE(S). THIS OBLIGATION SHALL CONTROL OVER ANY CONFLICTING OR INCONSISTENT LANGUAGE CONTAINED HEREIN.

   b. **Marketing Commencement Date:** 02/24/2023 _____. This shall be the date when the Property is first marketed to the public. Seller shall have the right, upon notice to Broker, to move this date up or back by not more than 30 _____ days.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH John Ball **IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.**
Copyright© 2023 by Georgia Association of REALTORS®, Inc.          F101, Exclusive Seller Brokerage Engagement Agreement, Page 1 of 10, 01/01/23

**4. Commission.** *[Select one or more of the following below.]*

a. Seller agrees to pay Broker the following commission ("Commission") at the closing of any Contract to Sell (as that term is hereinafter defined) of the Property as follows:

☑ 3 _____ percent (%) of the sales price;

☐ $_____ ;

☐ (other)_____ .

b. Broker agrees to pay cooperating broker, if any,

☑ 3 _____ % of the sales price;

☐ $_____ ;

☐ (other)_____ .

c. **Commission Adjustment to Cooperating Broker:** There may be circumstances where Seller's Broker shall not pay the cooperating broker the Commission referenced in Section A.4(b) above. These circumstances and the Commission that shall be paid in such circumstances are as follows _____
_____
_____

☐ Check if an additional page(s) (F801) is attached (in which event, the same are incorporated herein).

d. **Separate Commission on Lease.** If Seller leases the Property or enters into a lease/purchase agreement or a lease with an option to purchase agreement during this Agreement, Seller shall also pay Broker a separate leasing commission in the amount of $_____ , and as follows: _____ . Notwithstanding any provision to the contrary contained herein, the payment of a leasing Commission (including in lease/purchase transactions or lease with an option to purchase transactions) shall not relieve Seller from paying the Commission at the closing of a Contract to Sell, as provided elsewhere in this Agreement.

**5. Protected Period.** The length of Protected Period, as that term is herein defined, shall be _____ days.

**6. Agency and Brokerage.**

a. The following are types of agency relationship(s) **NOT** offered by Broker:

☐ seller agency  ☐ buyer agency  ☐ designated agency  ☑ dual agency  ☐ sub-agency  ☐ tenant agency  ☐ landlord agency

b. If Broker offers dual agency as one of its agency relationships above, Seller ☐ does or ☐ does not consent to Broker acting in a dual agency capacity, as that agency relationship is explained in Section B.6(b) below and in the CB01 ABCs of Agency. Seller expressly consents to Broker acting in any other agency relationship offered by Broker.

**7. Lead-Based Paint Disclosure.** Federal law requires disclosure of lead-based paint in homes/residential properties, or a portion thereof, constructed prior to 1978. *[select one below]*

a. ☐ A dwelling on the Property, or portion thereof, was constructed prior to 1978, Seller agrees to complete and provide Broker with a signed Lead-Based Paint Disclosure Exhibit (F316) at the same time as the signing of this Agreement and is attached as Exhibit "____ ."

OR

b. ☐ No dwelling on the Property, or portion thereof, was constructed prior to 1978.

**8. Seller Has the Following Special Circumstances That Will Require Third-Party Approval Before Seller Can Do the Following:**

a. **List the Property for Sale:**

☐(1) ~~Bankruptcy: Seller has filed for bankruptcy protection and this Agreement is made contingent upon the bankruptcy court authorizing the listing of the Property for sale.~~

☐(2) **Divorce:** Seller has filed for divorce and this Agreement is made contingent upon the court having jurisdiction over the divorce action authorizing the listing of the Property for sale.

☐(3) **Other (Please describe):** _____
_____

b. **Contract to Sell the Property:**

☐(1) ~~Bankruptcy: Seller has filed for bankruptcy protection. Any purchase and sale agreement for the sale of the Property will need to be conditioned upon the approval of the bankruptcy court.~~

☐(2) **Divorce:** Seller has filed for divorce. Any purchase and sale agreement for the sale of the Property will need to be conditioned upon the approval of the court having jurisdiction over the divorce.

☐(3) **Short Sale:** The sale of the Property will not generate sufficient proceeds to pay off the Broker's real estate commission and all mortgages or liens on the Property. Therefore, the purchase and sale agreement for the sale of the Property will need to be made contingent upon the mortgage lender(s) and other lien holders agreeing to take less than the face amount of what they are owed.

☐(4) **Seller Not On Title:** Seller does not yet have title to the Property and the purchase and sale agreement for the Property ☐ will or ☐ will not need to be subject to Seller acquiring title to the Property.

☑(5) **Other (Please describe):** Upon Bankruptcy approval of any proposed sale of the Property, Trustee will execute a Trustee's Deed conveying title of the Property to the Purchaser(s).

**9. Negotiation.** Seller ☑ does **OR** ☐ does not authorize the Broker to assist, to the extent requested by Seller, in negotiating the terms of and filling out a pre-printed form contracts for Seller's review and approval.

## B. FURTHER EXPLANATIONS TO CORRESPONDING PARAGRAPHS IN SECTION A.

1. **Exclusive Seller Brokerage Engagement Agreement.** Seller has the full authority to enter into this Agreement for the listing of Seller's Property for sale. This Agreement may not be amended except by the written agreement of Seller and Broker. The failure of the parties to adhere strictly to the terms and conditions of this Agreement shall not constitute a waiver of the right of the parties later to insist on such strict adherence. Seller is not a party to any other exclusive seller brokerage engagement agreement and all such previous agreements, if any, have expired and not been renewed. Seller acknowledges that Seller may have to pay a previous broker a real estate commission if Seller is subject to a current seller brokerage engagement agreement or has terminated a previous seller brokerage engagement agreement without the consent of the previous broker.

2. **List Price and Listing Period.**
   a. **List Price:** Seller agrees to list the Property for sale at the list price specified in this Agreement. The failure of the Property to be shown or sell at the list price may be an indication that the list price for the Property is too high.
   b. **Initial Listing Period When Property is Under Contract to Sell:** If the Property is under a Contract to Sell, as that term is defined below, during the Listing Period, but the Listing Period expires prior to the closing, then the Listing Period shall be automatically extended through the closing of the Contract to Sell.
   c. **Extension:** If during the term of this Agreement, Seller and a prospective buyer enter into: 1) a real property purchase and sale agreement for the Property; 2) a contract to exchange property, including the Property; 3) an option contract for the sale of the Property; or 4) a contract to sell the shares or partnership or membership interests in the legal entity constituting Seller (hereinafter, collectively referred to in this Agreement as a "Contract to Sell") which is not consummated or closed for any reason whatsoever, then the Listing Period may be extended unilaterally by Broker for the number of days that Property was under the Contract to Sell (hereinafter, "Extension Period") by Broker providing written notice of the same to Seller within five (5) days of the Contract to Sell not being consummated but in no event later than prior to the expiration of this Agreement (hereinafter, "Notification Period"). If such written notice is not given before the end of the Notification Period, then the Extension Period for that transaction shall be deemed to have been waived by Broker.

3. **Marketing.**
   a. **Generally:** Broker is authorized to market and advertise Property for sale in any media of Broker's choosing, including the Internet and multiple listing services, and attempt to procure buyers for the Property in cooperation with other real estate brokers and their affiliated licensees. Seller acknowledges that in listing the Property in a multiple listing service, all members of multiple listing services and real estate related third parties will have access to Seller's listing information including images and recordings and the right to use all available technology to create, download, store, supplement and manipulate such listing information to assist Seller in the sale of the Property and for tracking and analyzing real estate transactions. As such, Broker may not always have control over aspects of the marketing of the Property. Any media created or purchased by Broker to be used in the marketing effort shall not belong to or be the property of the Seller and may not be copied, reproduced, or used by Seller or other third parties without the express written permission of the Broker. Seller warrants that any media provided or paid for by Seller is the property of the Seller. Seller agrees to indemnify the Broker for any claim by a third party related to the use of the provided media. Broker shall be allowed to use Seller provided materials, during the term of this Agreement, with any third-party for the purposes of marketing the property, and Seller acknowledges that Broker shall not be liable to Seller for the continued use of media by third-parties after the termination of the Agreement. Seller agrees not to place any advertisements on the Property or to advertise the Property for sale in any media except with the prior written consent of Broker. Broker is also hereby authorized to place Broker's "For Sale" sign on Property. If the Property is sold or a Contract to Sell the Property is entered into during the term of this Agreement, the Broker may advertise the Property (including images thereof) in any media of Broker's choosing as being "under contract" while a sale is pending and as being "sold" upon the closing of the Property (except nothing herein shall permit Broker to place a Sold sign on property no longer owned by Seller except with the written permission of the new owner).
   b. **Images:** Seller agrees to remove any personal property prior to listing the Property of which Seller does not want images to be so captured. Broker shall not be liable to Seller if other brokers or buyers take photographs, videos or use other technology to capture and manipulate images of the Property without the permission of the Seller and Broker.
   c. **Multiple Listing Service(s):** Broker agrees to file this Agreement with the above referenced Multiple Listing Service(s) within one (1) business day of the Marketing Commencement Date, which shall be the date the Property is made available to the public. Marketing of the property to the public includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks and applications available to the general public. Internal marketing that only goes to other licensees within the Seller's Broker's firm is not considered public facing marketing unless it is distributed to licensees outside of the brokerage firm. Seller acknowledges that the MLS(s) is/are not a party to this Agreement and is/are not responsible for errors or omissions on the part of Seller or Broker. Seller agrees to indemnify Service(s) from and against any and all claims, liabilities, damages or losses arising out of or related to the listing and sale of Property. Seller acknowledges that by virtue of listing the Property in MLS(s), all MLS(s) members and their affiliated licensees, will have access to Seller's listing information for the purpose of assisting Seller in the sale of the Property.
   d. **Consent of Seller to be Called:** If Seller is on a "Do Not Call List," Seller expressly consents to Broker calling Seller for any purpose related to the sale of the Property. This paragraph shall survive the termination of this Agreement.
   e. **Lockboxes:** A lockbox may be used in connection with the marketing of Property. There have been isolated instances of reported burglaries of homes on which lockboxes have been placed and for which the lockbox has been alleged to have been used to access the home. In order to minimize the risk of misuse of the lockbox, Broker recommends against the use of lockboxes on door handles that can be unscrewed from the outside or on other parts of the home from which the lockbox can be easily removed. Since prospective buyers and others will have access to Property, Seller agrees to either remove all valuables, prescription drugs and/or keys, or put them in a secure place.

f. **No Marketing by Seller:** Seller is encouraged to communicate the availability of the Property for sale to friends and other acquaintances. However, since Broker has been hired to exclusively market and show the Property, Seller shall not, with respect to the sale of the Property, prepare and distribute marketing materials, hold open houses, put up signs regarding the Property, create websites for the Property, prepare flyers, brochures or videos or engage in other similar activities without the prior written consent of Broker.

4. **Commission.**
   a. **Obligation to Pay Commission**: In the event that Seller enters into a Contract to Sell or lease, lease/purchase, or lease with an option to purchase the Property or any portion thereof during the term of this Agreement with any buyer, seller agrees to pay Broker's Commission at the closing (regardless of whether the closing is during or after the term of this Agreement), and if applicable, Broker's Leasing Commission prior to the commencement of a lease, lease/purchase, or lease with an option to purchase.
   b. **Sharing of Broker's Commission with Cooperating Broker:** If specified in Section A herein, Broker shall share this commission with a cooperating broker, if any, who procures the buyer of Property by paying such cooperating broker at closing the percent (%) of the sales price of Property referenced above **OR** the flat amount, if any. There may be times when the Broker may not pay the cooperating broker the full amount of the commission as set forth in Section A herein. If this Agreement specifies that no commission is being paid by the Seller's Broker to the cooperating broker, then no such commission obligation shall exist. Seller's Broker shall have no obligation to pay any cooperating broker who is not a participant of any of the Multiple Listing Service(s) in which the Property is listed a commission unless cooperating broker has negotiated and executed with the Seller's Broker a Co-Op Commission Agreement (F258).
   c. **Separate Commission on Lease:** Notwithstanding the above, if Seller leases real property or enters into a lease/purchase or lease with an option to purchase contract during this Agreement, Seller shall also pay Broker a separate Leasing Commission in the amount as indicated elsewhere in this Agreement. Notwithstanding any provision to the contrary contained herein, the payment of a leasing commission (including in lease purchase and lease with an option to purchase transactions) shall not relieve Seller from paying the Commission at the closing of a Contract to Sell, as provided elsewhere in this Agreement.

5. **Protected Period.** The Protected Period shall be the period of time set forth in this Agreement commencing upon the expiration or the unilateral termination of this Agreement by Seller during which Broker shall be protected for its Commission or Leasing Commission, as applicable. If this Agreement is unilaterally terminated by Seller without the consent of the Broker, the Protected Period shall be the number of days remaining on what would have been the original listing as of the date the Seller terminates the Agreement plus the number of days set forth as the Protected Period in Section A.5 of this Agreement. There shall be no Protected Period if Broker and Seller mutually agree to terminate this Agreement. In the event that during the Protected Period, Seller enters into a Contract to Sell or lease, lease/purchase, or lease with an option to purchase of all or any portion of the Property which during the term of this Agreement was submitted to, identified or shown to any buyer (either in person or virtually), was provided specific information about or inquired about the Property, either directly or through a broker working with the buyer, then Seller shall pay Broker at closing or the commencement of the lease, lease/purchase, or lease with an option to purchase, as applicable, the Commission or Leasing Commission set forth above.

Notwithstanding the above, if this Agreement expires (and is not unilaterally terminated by Seller) an exception to the above Commission obligations shall apply and no Commission or Leasing Commission, as applicable, shall be due, owing or paid to Broker if Seller enters into a Contract to Sell or lease, lease/purchase, or lease with an option to purchase all or any portion of the Property during the Protected Period by or through another licensed broker with whom Seller has signed an exclusive seller brokerage engagement agreement. This exception shall not apply if the Agreement is unilaterally terminated by Seller. The Commission rights and obligations set forth herein shall survive the termination of this Agreement.

6. **Agency and Brokerage.**
   a. **Broker's Policy on Agency:** Unless Broker has indicated elsewhere herein that Broker is not offering a specific agency relationship, the types of agency relationships offered by Broker are: seller agency, buyer agency, designated agency, dual agency, sub-agency, landlord agency, and tenant agency.
   b. **Dual Agency Disclosure:** *[Applicable only if Broker's agency policy is to practice dual agency and Seller has consented to Broker acting in a dual agency capacity.]* If Seller and a prospective buyer are both being represented by the same Broker and the Broker is not acting in a designated agency capacity, Seller is aware that Broker is acting as a dual agent in this transaction and hereby consents to the same. Seller has been advised that:
      (1) In serving as a dual agent, Broker is representing two parties, Seller and the buyer, as clients whose interests are or at times could be different or even adverse;
      (2) Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from either party which is not otherwise required to be disclosed by law;
      (3) Seller does not have to consent to dual agency. The consent of the Seller to dual agency has been given voluntarily in Section A and the Seller has read and understands this Agreement.
      (4) Notwithstanding any provision to the contrary contained herein, Seller hereby directs Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position except as required by law.
      (5) Broker or Broker's affiliated licensees will timely disclose to each party the nature of any material relationship with other party other than that incidental to the transaction. A material relationship shall mean any actually known personal, familial, or business relationship between Broker and a party which would impair the ability of Broker to exercise fair and independent judgment relative to another client. The other party whom Broker may represent in the event of dual agency may not be identified at the time Seller enters into this Agreement. If any party is identified after the Agreement and has a material relationship with Broker, then Broker shall timely provide to Seller a disclosure of the nature of such relationship.

(6) Upon signing this brokerage engagement with the dual agency disclosures contained herein, Seller's consent to dual agency is conclusively deemed to have been given and informed in accordance with state law, provided that Seller has consented to Broker acting in a dual agency capacity in Section A(6) above.

**c.** **Designated Agency Disclosure:** *[Applicable only if Broker's agency policy is to practice designated agency.]* Seller does hereby consent to Broker acting in a designated agency capacity in transactions in which Broker is representing Seller and a prospective buyer, but where Broker assigns one or more of its affiliated licensees exclusively to represent the Seller and one or more of its other affiliated licensees exclusively to represent the prospective buyer.

**d.** **No Other Adverse Agency Relationships:** Unless specified herein, Broker has no other known agency relationships with other parties which would conflict with any interests of Seller (except that Broker may represent other buyers, sellers, landlords, and tenants in buying, selling or leasing property).

**7.** <u>Lead-Based Paint Disclosure</u>. As required by federal law (*Residential Lead-Based Paint Hazard Reduction Act of 1992, Title X*), if any portion of a residential dwelling was built prior to 1978, the Lead-Based Paint Disclosure Exhibit (F316) is hereby attached as an exhibit to this Agreement. The term "residential dwelling" includes any painted fixture or material used therein that was built or manufactured prior to 1978. Broker is hereby authorized to distribute any Lead-Based Paint Exhibit to buyer interested in Property.

**8.** <u>Special Circumstances</u>.
   **a.** The sale of Property is contingent upon a third party's approval as indicated above. It shall be Seller's responsibility to seek to fulfill any contingency or condition selected herein, if any, and ensure that the purchase and sale agreement is made subject to any such contingency or condition.
   **b.** Broker agrees to keep confidential all information which Seller asks to be kept confidential by express request or instruction unless Seller permits such disclosure by subsequent word or conduct or such disclosure is required by law. Seller acknowledges, however, that buyer and buyer's broker may possibly not treat any offer made by Seller (including its existence, terms and conditions) as confidential unless those parties have entered into a Confidentiality Agreement with Seller.
   **c.** Broker may not knowingly give customers false information.
   **d.** In the event of a conflict between Broker's duty not to give customers false information and the duty to keep the confidences of Seller, the duty not to give customers false information shall prevail.

**9.** <u>Negotiation</u>. While Broker may assist Seller in negotiating the terms of a Contract to Sell, if Seller has elected to have Broker assist in this role, all decisions regarding price, terms and other conditions in a Contract to Sell shall still be made by Seller.

**C. OTHER TERMS AND CONDITIONS**

**1.** ~~Seller's Property Disclosure Statement.~~ ~~Georgia Law (O.C.G.A. §51-6-2) requires that a Seller disclose known latent defects in the Property which could not be observed by Buyer upon a reasonable inspection of the Property. This is the case even if the Property is sold in "as-is" condition. Within three (3) days of the date of this Agreement, Seller agrees to provide Broker with a current, fully executed Seller's Property Disclosure Statement or Disclosure of Latent Defects & Fixtures Checklist. Broker is hereby authorized to distribute the Seller's Property Disclosure Statement to buyers interested in Property. Seller agrees to promptly update any of the above referenced disclosure documents through the Closing should any changes occur.~~  Seller will not make disclosure regarding the Property.

**2.** <u>Hazardous Conditions on Property</u>. Seller acknowledges that Seller owes a duty of reasonable care to keep the Property safe for prospective buyers and their agents who to view and inspect the Property. Among other things, this includes a duty to warn such invitees of dangerous conditions that would not be obvious to an invitee. Seller is encouraged to inspect the Property for hazardous conditions and correct and eliminate all such conditions. Seller agrees to indemnify and hold Broker harmless from and against any and all claims, causes of action, suits, and damages arising out of or relating to a person or persons being injured or harmed while on the Property.

**3.** <u>Limits on Broker's Authority and Responsibility</u>. Seller acknowledges and agrees that Broker:
   **a.** may show other properties to prospective buyers who are interested in Property;
   **b.** shall have no duty to inspect the Property or advise buyer or Seller on any matter relating to the Property which could have been revealed through a survey, appraisal, title search, Official Georgia Wood Infestation Report, utility bill review, septic system inspection, well water test, tests for radon, asbestos, mold, and lead-based paint; inspection of the Property by a licensed home inspector, construction expert, structural engineer, or environmental engineer; review of this Agreement and transaction by an attorney, financial planner, mortgage consultant, or tax consultant; and consulting appropriate governmental officials to determine, among other things and without limitation, the zoning of the Property, the propensity of the Property to flood, flood zone certifications, whether any condemnation action is pending or has been filed or other nearby governmental improvements are planned. Seller acknowledges that Broker does not perform or have expertise in any of the above tests, inspections, and reviews or in any of the matters handled by the professionals referenced above. Seller should seek independent expert advice regarding any matter of concern to Seller relative to the Property and this Agreement. Seller acknowledges that Broker shall not be responsible to monitor or supervise or inspect any portion of any construction or repairs to Property and that such tasks fall outside the scope of real estate brokerages services;
   **c.** shall owe no duties to Seller nor have any authority on behalf of Seller other than what is set forth in this Agreement;
   **d.** shall make all disclosures required by law;
   **e.** shall not be responsible for ensuring that Seller complies with the duties and deadlines contained in any Contract to Sell entered into by Seller and that Seller shall be solely responsible for the same; and
   **f.** shall be indemnified and held harmless by Seller from any and all claims, causes of action, or damages arising out of or relating to:
      (1) inaccurate and/or incomplete information provided by Seller to Broker;
      (2) earnest money handled by anyone other than Broker;
      (3) Seller's negligence or intentional wrongdoing;

(4) any loss or theft of valuables, prescription drugs, keys, or other personal property, relating to the use of a lockbox or an open house resulting from Seller's failure to remove or secure the same;

(5) the existence of undisclosed material facts about the Property or the transaction; and

(6) any damages or injuries occurring on the Property as a result of dangerous or defective conditions on the Property or the failure to secure or restrain pets.

g. shall have no authority to bind Seller to any Contract to Sell or give notices on behalf of Seller other than to forward, if requested by Seller, a notice signed by Seller pertaining to a real estate transaction. Under the standard GAR Purchase and Sale Agreement Forms, notice received by the Broker is deemed to be notice received by the Seller.

4. <u>LIMIT ON BROKER'S LIABILITY.</u> SELLER ACKNOWLEDGES THAT BROKER:
   a. SHALL, UNDER NO CIRCUMSTANCES, HAVE ANY LIABILITY GREATER THAN THE AMOUNT OF THE REAL ESTATE COMMISSION PAID HEREUNDER TO BROKER (EXCLUDING ANY COMMISSION AMOUNT PAID TO A COOPERATING REAL ESTATE BROKER, IF ANY) OR, IF NO REAL ESTATE COMMISSION IS PAID TO BROKER, THEN THE SUM OF $100; AND
   b. NOTWITHSTANDING THE ABOVE, SHALL HAVE NO LIABILITY IN EXCESS OF $100 FOR ANY LOSS OF FUNDS AS THE RESULT OF WIRE OR CYBER FRAUD.

5. <u>Disclosure of Potentially Fraudulent Activities</u> as required by the Georgia Residential Mortgage Fraud Act (O.C.G.A. § 16-8-100 et seq.)
   a. To help prevent fraud in real estate transactions, Seller does hereby give Broker permission to report any suspicious, unusual and/or potentially illegal or fraudulent activity (including but not limited to mortgage fraud) to:
      (1) Governmental officials, agencies and/or authorities and/or
      (2) Any mortgage lender, mortgage insurer, mortgage investor and/or title insurance company which could potentially be harmed if the activity was in fact fraudulent or illegal.
   b. Seller acknowledges that Broker does not have special expertise with respect to detecting fraud in real estate transactions. Therefore, Seller acknowledges that:
      (1) Activities which are fraudulent or illegal may be undetected by Broker; and
      (2) Activities which are lawful and/or routine may be reported by Broker as being suspicious, unusual or potentially illegal or fraudulent.

6. <u>Miscellaneous.</u>
   a. **Arbitration:** All claims arising out of or relating to this Agreement and the alleged acts or omissions of any or all the parties hereunder ~~shall be resolved by arbitration in accordance with the Federal Arbitration Act 9 U.S.C. § 1 et. seq. and the rules and procedures of the arbitration company selected to administer the arbitration. Upon making or receiving a demand for arbitration, the parties shall work together in good faith to select a mutually acceptable arbitration company with offices in Georgia to administer and conduct the arbitration. If the parties cannot mutually agree on an arbitration company, the company shall be selected as follows. Each party shall simultaneously exchange with the other party a list of three arbitration companies with offices in Georgia acceptable to that party to administer and conduct the arbitration. If there is only one (1) arbitration company that is common to both lists, that company shall administer and conduct the arbitration. If there is more than one arbitration company that is common to both lists, the parties shall either mutually agree on which arbitration company shall be selected or flip a coin to select the arbitration company. If there is not initially a common arbitration company on the lists, the parties shall repeat the process by expanding their lists by two each time until there is a common name on the lists selected by the parties. The decision of the arbitrator shall be final and the arbitrator shall have authority to award attorneys' fees and allocate the costs of arbitration as part of any final award. All claims shall be brought by a party in his or her individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. Notwithstanding anything to the contrary contained herein, this agreement to arbitrate shall not apply to: (1) any claim regarding the handling and disbursement of earnest money; and (2) any claim of Broker regarding the entitlement to or the non-payment of a real estate commission hereunder.~~ **(Continued below)**

   b. **Assignability:** As part of a sale of all or substantially all of the assets of Broker to another brokerage firm, Seller consents to this Agreement being assigned by Broker to the other brokerage firm. In such event, the assignee, upon consenting to the assignment, shall: (1) thereafter be responsible for performing all of the duties and responsibilities of the assignor under this Agreement; and (2) have all of the rights of assignor including the right to receive the commissions under the Agreement.

   c. ~~**Attorney's Fees:** In the event this Agreement, or any provision therein, is enforced through or is the subject of a dispute resulting in litigation or arbitration, the prevailing party shall be entitled to recover its actual attorney's fees, reasonably incurred.~~

   d. **Broker:** Where the context indicates the term "Broker" shall include Broker's affiliated licensees.

   e. **Definition of Seller and Buyer:** For the purposes of this section, the term "Seller" shall include Seller, all members of the Seller's immediate family, any legal entity in which Seller or any member of Seller's immediate family owns or controls, directly or indirectly, more than ten percent (10%) of the shares or interests therein, and any third party who is acting under the direction or control of any of the above parties. For the purposes of this Agreement, the term "buyer" shall include buyer, all members of the buyer's immediate family, any legal entity in which buyer or any member of buyer's immediate family owns or controls, directly or indirectly, more than ten percent (10%) of the shares or interests therein, and any third party who is acting under the direction or control of any of the above parties.

   f. **Entire Agreement:** This Agreement represents the entire agreement of the parties with respect to listing of the Property for sale and is intended to supersede all prior written and verbal agreements of the parties hereto. No representation, statement, promise, or inducement not contained herein shall be binding on either party hereto. This Agreement shall be binding on the heirs of the Seller.

   g. **Fair Housing Disclosure:** Seller acknowledges that Broker is committed to providing equal housing opportunities to all persons and that Seller and Broker are obligated to comply with state and federal fair housing laws in selling the Property. Seller and Broker agree not to discriminate in the sale of the Property on the basis of race, color, religion, national origin, sex, familial status, disability, sexual orientation or gender identity.

   **Continued from 6(a)**

   **"shall be subject to the jurisdiction of the U.S. Bankruptcy Court, Northern District of Georgia, Atlanta Division, in re Terrence Griffin and Kimberly Griffin, Case No. 22-56997-BEM"**

**h. GAR Forms:** The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. Since these forms are generic and written with the interests of multiple parties in mind, they may need to be modified to meet the specific needs of the parties using them. If any party has any questions about his or her rights and obligations under any GAR form, he or she should consult an attorney. Provisions in the GAR Forms are subject to differing interpretations by our courts other than what the parties may have intended. At times, our courts may strike down or not enforce provisions in our GAR Forms, as written. No representation is made that the GAR Forms will protect the interests of any particular party or will be fit for any specific purpose. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

**i. Governing Law and Interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than another. All references to time shall mean the time in Georgia. If any provision herein is held to be unenforceable, it shall be severed from this Agreement while the remainder of the Agreement shall, to the fullest extent permitted by law, continue to have full force and effect as a binding contract.

**j. Independent Contractor Relationship:** This Agreement shall create an independent contractor relationship between Broker and Seller. Broker shall at no time be considered an employee of Seller. Unless otherwise stipulated, all affiliated licensees of Broker are independent contractors of Broker.

**k. No Imputed Knowledge:** Seller acknowledges and agrees that with regard to any property which Seller intends to sell, there shall be no knowledge imputed between Broker and Broker's licensees or between the different licensees of Broker. Broker and each of Broker's licensees shall be deemed to have only actual knowledge of such properties.

**l. Notices Between Seller and Broker:**
  (1) Communications Regarding Real Estate Transactions: Seller acknowledges that many communications and notices in real estate transactions are of a time sensitive nature and that the failure to be available to receive such notices and communications can have adverse legal, business and financial consequences. During the term of this Agreement, Seller agrees to remain reasonably available to receive communications from Broker.
  (2) Notices between Broker and Seller Regarding this Agreement: Seller and Broker agree that communications and notices between them regarding the terms of this Agreement shall be in writing, signed by the party giving the notice, and may be delivered in person or to any address, e-mail address and/or facsimile number to the person to whom the communication or notice is being given specifically set forth in this Agreement. It is the intent of the parties that those means of transmitting notices for which a party has not provided an address or number shall not be used for receiving notices and communications. For example, if a party has not provided an e-mail address in this Agreement, it shall mean that the party is not accepting notices or communications sent by this means.

**m. Referrals:** Seller hereby authorizes Broker to refer Seller to another real estate licensee or broker for brokerage or relocation services, or to a builder for services, not related to the sale of the Property. Seller acknowledges and agrees that Broker may receive a valuable consideration for the referral.

**n. Statute of Limitation:** All claims of any nature whatsoever against Broker and/or their affiliated licensees, whether asserted in litigation or arbitration and sounding in breach of contract and/or tort, must be brought within two (2) years from the date any claim or cause of action arises. Such actions shall thereafter be time-barred.

**o. Survival:** The rights and obligations of Broker to a commission subsequent to the termination or expiration of this Agreement as set forth herein, the limitation of liability, the obligation to arbitrate and indemnify Broker and other similar provisions that by their terms are meant to protect Broker shall survive the termination of this Agreement.

**p. Third Party Vendors:** Broker may provide Seller with the names of vendors to perform services on behalf of Seller relative to real estate transactions involving Seller. Broker does not warrant or endorse the performance of any such vendor and the names of vendors are provided solely as a courtesy and starting point for Seller to identify possible vendors to perform services on behalf of Seller. Seller agrees to do his or her own due diligence regarding the skills, expertise and reputation of all such vendors performing services for Seller and the terms of all contracts with vendors (including whether there is a limitation of liability in such contracts). All decisions regarding which vendor to hire shall be solely that of Seller.

**q. Time of Essence:** Time is of the essence of this Agreement.

**r. Use of Initials "N/A":** The use of the initials "N/A" or "N.A." in filling out a blank in this Agreement shall mean "not applicable".

7. **Broker's and Seller's Duties.**
  **a. Broker's Duties to Seller.** Broker shall promote the interests of the Seller by:
  (1) seeking a sale price at the price and terms stated in this Agreement or at a price and terms acceptable to Seller; provided, however, Broker shall not be obligated to seek additional offers to purchase the Property while the Property is subject to a Contract to Sell, unless brokerage engagement so provides;
  (2) timely presenting all offers to and from the Seller, even when Property is subject to a Contract to Sell;
  (3) disclosing to the Seller material facts which the Broker has actual knowledge concerning the transaction;
  (4) advising Seller to obtain expert advice as to material matters which are beyond the expertise of Broker; and
  (5) timely accounting for all money and property received in which the Seller has or may have an interest.
  **b.** Broker shall keep confidential all information received by Broker during the course of the engagement which is made confidential by an express request or instruction from Seller unless Seller permits such disclosure by subsequent word or conduct, or such disclosure is required by law; provided, however, that disclosures between Broker and any of Broker's affiliated licensees assisting Broker in representing Seller shall not be deemed to breach the duty of confidentiality described above.

c. **Seller's Duties.** Seller will do the following:

   (1)  cooperate with Broker to sell the Property to prospective buyers and will refer all inquiries concerning the sale of Property to the Broker during the term of this Agreement;

   (2)  make the Property available for showing at reasonable times as requested by Broker;

   (3)  provide Broker with accurate information regarding the Property (including information concerning all adverse material facts pertaining to the physical condition of Property);

   (4)  comply with all local, state and federal laws applicable to the sale of the Property; and

   (5)  carefully read all Contracts to Sell before signing them and comply with all duties and all time deadlines contained therein.

8. **Seller Default.**

  a. ~~**Events Constituting a Seller Default.** Seller shall be in breach of this Agreement if Seller:~~

   (1)  Terminates this Agreement prior to the end of the Agreement without the prior written agreement of Broker. Broker removing the listing from multiple listing service(s), taking down Broker's sign, ceasing to market the Property after this Agreement is unilaterally terminated by Seller and other similar activities shall not be evidence of the Broker's agreement to mutually terminate this Agreement, but shall instead merely be an acquiescence by Broker of the unilateral termination by Seller;

   (2)  Defaults under any Contract to Sell the Property resulting in such contract not closing;

   (3)  Agrees with a buyer of the Property to terminate a Contract to Sell without the consent of Broker; or

   (4)  Refuses to accept a lawful, bona fide, written offer to purchase the Property meeting the following terms and conditions at a time when the Property is not otherwise under contract:

     (a)  The purchase price in the offer, after deducting all fees, costs and contributions to be paid by the Seller (other than the real estate brokerage commission to be paid by Seller and the Seller's payment of ad valorem real property taxes through the date of closing) is for at least the full listing price set forth herein and is to be paid in cash or cash equivalent at the closing;

     (b)  The offer is not subject to contingencies, conditions precedent, due diligence periods, or required terms other than those set forth herein;

     (c)  The offer is not subject to Seller warranties or representations other than: (i) those warranties the Seller agrees to provide in any Seller's Property Disclosure Statement the Seller has filled out and made available to prospective buyers for inclusion in any offer, and (ii) the Seller warranting to convey good and marketable title (which for all purposes herein shall have the same meaning as set forth in the GAR Purchase and Sale Agreements) to the Property at closing by limited warranty deed; and

     (d)  The date of closing in the offer is not less than thirty (30) days nor more than forty-five (45) days from the offer date.

  Notwithstanding the above, in the event there are multiple offers to purchase the Property meeting the above criteria, Seller shall not be in breach of this Agreement if the Seller first gives the prospective buyers a reasonable opportunity (not exceeding ten (10) days from the date of the first offer) to make their best offer to purchase the Property and Seller accepts one of the offers.

  b. **Broker Remedies for Seller Default.** Seller shall immediately pay Broker the Commission referenced herein for any of the Seller defaults above, except for Seller unilaterally terminating this Agreement prior to the end of the Listing Period (as the same may have been extended as provided for herein). With respect to this event of default, Seller's obligation to pay Broker its Commission shall be controlled by the Protected Period sections of this Agreement.

  c. **Seller Default.** In the event Seller defaults under this Agreement, Seller shall, in addition to its other obligations set forth elsewhere herein, immediately reimburse Broker for the out-of-pocket costs and expenses incurred by Broker and Broker's affiliated licensees in seeking to market and sell the Property. Such costs and expenses shall include, without limitation, printing, and copying charges, mileage at the highest rate allowed by the IRS as a business deduction and expenses to advertise the Property in various media. Seller shall also pay all costs, fees and charges for removing the listing from any multiple listing service. The payment of these costs, fees, charges and expenses by Seller shall not waive or limit Broker's right to assert any other claim, cause of action or suit (hereinafter collectively, "Claims") against Seller for Broker's Commission and /or other damages and shall not release Seller from such Claims. Notwithstanding the above, the amount of such fees, charges, costs and expenses paid by Seller to Broker hereunder shall be an offset against any Claim of Broker for a Commission.

9. **WARNING TO BUYERS AND SELLERS: BEWARE OF CYBER-FRAUD.** Fraudulent e-mails attempting to get the buyer and/or seller to wire money to criminal computer hackers are increasingly common in real estate transactions. Specifically, criminals are impersonating the online identity of the actual mortgage lender, closing attorney, real estate broker or other person or companies involved in the real estate transaction. In that role, the criminals send fake wiring instructions attempting to trick buyers and/or sellers into wiring them money related to the real estate transaction, including, for example, the buyer's earnest money, the cash needed for the buyer to close, and/or the seller's proceeds from the closing. These instructions, if followed, will result in the money being wired to the criminals. In many cases, the fraudulent email is believable because it is sent from what appears to be the email address/domain of the legitimate company or person responsible for sending the buyer or seller wiring instructions. The buyer and/or seller should verify wiring instructions sent by email by independently looking up and calling the telephone number of the company or person purporting to have sent them. Buyers and sellers should never call the telephone number provided with wiring instructions sent by email since they may end up receiving a fake verification from the criminals. Buyer and sellers should be on special alert for: 1) emails directing the buyer and/or seller to wire money to a bank or bank account in a state other than Georgia; and 2) emails from a person or company involved in the real estate transaction that are slightly different (often by one letter, number, or character) from the actual email address of the person or company.

10. **Brochures.** Brochures referenced herein are prepared courtesy of GAR. The recommendations contained therein are general in nature and may not be applicable to the transaction reflected in this Agreement, and are not intended to either be exhaustive or specific advice that Seller should rely on without Seller first consulting with independent experts and professionals of Seller's own choosing to ensure that Seller is protected.

**The following Brochures have been received by the Seller(s):** (Check all that apply. Any box not checked means the Seller(s) has not received that brochure or other consumer information)

☐ GAR CB01 – The ABC's of Agency

☐ GAR CB04 – Lead Based Paint Pamphlet

☐ GAR CB07 – Mold Pamphlet

☐ GAR CB08 – EPA Home Buyer's and Seller's Guide to Radon Pamphlet

☐ GAR CB10 – Protect Yourself When Selling Real Property

☐ GAR CB28 – What Buyers and Sellers Should Know About Short Sales and Distressed Properties

☐ Other: _____

☐ Other: _____

11. **Exhibits and Addenda.** All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement. If any such exhibit or addenda conflicts with any preceding paragraph (including any changes thereto made by the parties), said exhibit or addendum shall control:

☑ Legal Description Exhibit (F807 or other) "____B____"

☐ Lead-Based Paint Exhibit (F316) "_____"

☐ Retainer Fee Exhibit (F149) "_____"

☑ Other: Special Stipulation "A"  _____

☐ Other: _____

**SPECIAL STIPULATIONS:** The following Special Stipulations, if conflicting with any exhibit, addendum, or preceding paragraph, shall control:

See Exhibit "A" Special Stipulations to this Agreement.

☐ **Additional Special Stipulations (F246) are attached.**

Copyright© 2023 by Georgia Association of REALTORS®, Inc.

BY SIGNING THIS AGREEMENT, SELLER ACKNOWLEDGES THAT: (1) SELLER HAS READ ALL PROVISIONS AND DISCLOSURES MADE HEREIN; (2) SELLER UNDERSTANDS ALL SUCH PROVISIONS AND DISCLOSURES AND HAS ENTERED INTO THIS AGREEMENT VOLUNTARILY; AND (3) SELLER IS NOT SUBJECT TO A CURRENT SELLER BROKERAGE ENGAGEMENT AGREEMENT WITH ANY OTHER BROKER.

## SELLER'S ACCEPTANCE AND CONTACT INFORMATION

1 Seller's Signature

S. Gregory Hays, as Chapter 7 Trustee for the bankruptcy case of Terrence Griffin and Kimberly Griffin (Case No. 22-56997)

2 Seller's Signature

Print or Type Name                    Date

Seller's Address for Receiving Notice

Seller's Address for Receiving Notice

Seller's Phone Number:  ☐ Cell  ☐ Home  ☐ Work

Seller's Phone Number:  ☐ Cell  ☐ Home  ☐ Work

Seller's E-mail Address

Seller's E-mail Address

☐ Additional Signature Page (F146) is attached.

## BROKER / BROKER'S AFFILIATED LICENSEE CONTACT INFORMATION

Humphries & King Realty
Brokerage Firm

Broker/Affiliated Licensee Signature

John Ball
Print or Type Name                    Date

(404) 418-2772
Licensee's Phone Number    Fax Number

386751
GA Real Estate License Number

HKRL01              H-76339
MLS Office Code       Brokerage Firm License Number

404-720-2965
Broker's Phone Number       Fax Number

830 Glenwood Ave., Suite 510-205, Atlanta, GA 30316
Broker's Address

John@HKAtlanta.com
Licensee's E-mail Address

REALTOR® Membership

RECEIPT OF A COPY OF THIS AGREEMENT IS HEREBY ACKNOWLEDGED BY SELLER.

The above Agreement is hereby accepted _____ o'clock _____ .m. on the date of

_____.

Copyright© 2023 by Georgia Association of REALTORS®, Inc.

<u>**Exhibit "A"**</u>

**SPECIAL STIPULATIONS:**   The following Special Stipulations, if conflicting with any preceding paragraph, shall control:

1.     The "Seller" of the Property means S. Gregory Hays as and only as Trustee for the Bankruptcy Estates of Terrence Griffin and Kimberly Griffin, Chapter 7 Case No. 22-56997-BEM.

2.     Seller's Property Disclosure Statement and Official Wood Infestation Report.  **Seller and Listing Broker have no specific knowledge and make no representations concerning the condition of the Property.  <u>Purchaser understands that the Property is being sold "AS IS"."WHERE IS.</u>**

3.     Notwithstanding anything contained in this Agreement to the contrary, the parties acknowledge that the sale of the real property which is the subject of this Agreement and all terms, conditions, warranties and representations contained herein, including Broker's 6% sales commission are subject to approval, and not binding without the approval, of the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division in Case No. 22-56997-BEM in accordance with Title 11 of the United States Code.

4.     Upon acceptance of any contract offer, the contract terms will be transferred to the Trustee's form Purchase and Sale Agreement following completion of due diligence and expiration of all contingencies.  All previous versions of the contract shall be null and void at that time, including the GAR contract.

5.     Seller warrants that Seller has title to the Property described herein and/or will have full authority to enter into this Agreement upon order of the Bankruptcy Court and that the information with respect to the Property as set out in this Agreement is true and correct to the best of the Seller's knowledge, it being understood that Trustee is a bankruptcy trustee who has no knowledge of the Property.

6.     The parties hereto acknowledge that the Agreement and all terms, conditions, warranties and representations are subject to the approval (and not binding without such approval) of the U.S. Bankruptcy Court, Northern District of Georgia, Atlanta Division, in Chapter 7 Case No. 22-56997-BEM.

7     In the event Seller contracts to sell the Property to any buyer, the parties hereto acknowledge that any contract for sale of the Property is subject to and contingent upon approval of the U.S. Bankruptcy Court, Northern District of Georgia, Atlanta Division, in Chapter 7 Case No. 22-56997-BEM, and no commission shall be paid unless or until Bankruptcy Court approval and closing of the sale, at which time Trustee will execute a Trustee's Deed transferring the Property, free and clear of all liens, interests and encumbrances.

02497217-1

8.      All parties agree that the closing shall take place no later than ten (10) days after the date the Court's Order approving the sale has been entered on the Court's Docket.

9.      The closing attorney shall be such attorney as selected by Seller.

10.     Earnest Money shall be at least two percent (2%) of the Purchase Price.

11.     Seller will make no repairs to the Property.

12.     In the event Seller sells or contracts to sell the Property to any buyer introduced to the Property by said broker within **sixty (60)** days after expiration of the listing period, then Seller shall pay the commission to said broker at the rate set herein at the closing on the sale or exchange of the Property subject to bankruptcy court approval.

Seller                                                    Agent

GSCCCA.org - Image Index

https://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=46681718&...

46491
00037

BK4649IPG0037

FILED AND RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY GA

**Exhibit B**

06 MAY 11 PM 2: 00

TOM LAWLER, CLERK

Return to.
Morris|Hardwick|Schneider, LLC
3237 Satellite Blvd., Bldg 300, Suite 120
Duluth, GA 30096
File #: DUL-0604011725

PT-61 #067-2006-017586
GWINNETT CO. GEORGIA
REAL ESTATE TRANSFER TAX
$ 309.00
TOM LAWLER CLERK OF
SUPERIOR COURT

**W A R R A N T Y   D E E D**

State of Georgia
County of Gwinnett

THIS INDENTURE made this 8th day of May, 2006, between

Kris E. Purvis and Suzanne L. Purvis

as party or parties of the first part, hereinafter called Grantor, and

Terrence M. Griffin and Kimberly Griffin

as Joint Tenants with Rights of Survivorship and not as Tenants in Common

as party or parties of the second part, hereinafter called Grantee (the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

W I T N E S S E T H that:  Grantor, for and in consideration of the sum of TEN AND 00/100 DOLLARS ($10.00) and other good and valuable consideration in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantee, the following described property:

**All that tract or parcel of land lying and being in Land Lot 54 of the 5th District, Gwinnett County, Georgia, being Lot 5, Block B, Kensington Subdivision fka Montclair, as per plat recorded in Plat Book 52, page 174, in the office of the Clerk of Superior Court of Gwinnett County, Georgia, which recorded plat is incorporated herein by reference and made a part of this description.**

Subject to all easements and restrictions of record.

TO HAVE AND TO HOLD the said tract or parcel of land, with all and singular the rights, members and appurtenances thereof, the same being, belonging, or in anywise appertaining, to the only proper use, benefit and behoof of the said Grantee, forever in FEE SIMPLE.

AND THE SAID Grantor will warrant and forever defend the right and title to the above described property unto the said Grantee against the claims of all persons whomsoever.

IN WITNESS WHEREOF, Grantor has hereunto set grantor's hand and seal this day and year first above written.

Signed, sealed and delivered in the presence of:

_____
Witness

_____
Notary Public
My Commission Expires:

_____ (Seal)
Kris E. Purvis

_____ (Seal)
Suzanne L. Purvis

0074472

Deed_Ga_WarrantyDeed_1T.rdw

DUL-0604011725

**EXHIBIT "B" FOLLOWS**

02497467-1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                                    :        CASE NO. 22-56997-BEM
                                          :
TERRENCE GRIFFIN and                      :        CHAPTER 7
KIMBERLY GRIFFIN,                         :
                                          :
        Debtors.                          :
                                          :
_____ :

**REAL ESTATE BROKER'S VERIFIED STATEMENT**
**PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 2014 AND 5002**

The undersigned hereby declares under penalty of perjury:

1.      I am a licensed real estate agent in the State of Georgia and am affiliated with Humphries & King Realty ("**Humphries & King**"), with offices located at 830 Glenwood Avenue, Suite 510-205, Atlanta, Georgia 30316. Humphries & King's Brokerage Firm License Number is H-76339.

2.      Humphries & King has been asked to represent S. Gregory Hays, as Chapter 7 Trustee for the bankruptcy case of Terrence Griffin and Kimberly Griffin ("**Debtors**"), in the value evaluation and sale of that certain improved real property located at 1895 Milfield Circle, Snellville, Gwinnett County, Georgia 30078 (the "**Property**").

3.      Humphries & King is experienced at providing opinions as to the valuation and at handling the sales of real property in the State of Georgia.

4.      Humphries & King is to be compensated for its services as a real estate broker at six (6%) percent of the selling price of the Property, which may

02497209-1

be shared with any selling agent involved in the sale of the Property, subject to Court approval after notice and hearing, which notice and hearing may be provided with the notice of the relevant sale of the Property.

5.      Except as set forth herein, neither I nor Humphries & King has a connection within the scope of Bankruptcy Rule 2014 with Debtors, Debtors' creditors, or any party in interest in this bankruptcy case, or any attorney or accountant thereof.

6.      Neither I nor Humphries & King are related to or have any connection within the scope of Bankruptcy Rules 2014 or 5002 with any Judge of the United States Bankruptcy Court, Northern District of Georgia. Moreover, neither I nor Humphries & King are related to or have any connection within the scope of Bankruptcy Rules 2014 or 5002 with any attorney, employee, or agent of the Office of the United States Trustee.

7.      To the best of my knowledge, information, and belief, Humphries & King and I are disinterested persons as that term is defined under 11 U.S.C. § 101(14).

Dated this _9th_ day of February, 2023.

John V. Ball, Realtor
Georgia Real Estate License No. 386751
Telephone: (404) 418-2772
Email: john@hkatlanta.com

02497209-1

## CERTIFICATE OF SERVICE

This is to certify that I have mailed a copy of the foregoing **APPLICATION TO EMPLOY REAL ESTATE BROKER UNDER LISTING AGREEMENT** by depositing in the United States mail a copy of same in a properly addressed envelope with adequate postage affixed thereon to assure delivery to:

Office of the U.S. Trustee
362 Richard B. Russell Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

S. Gregory Hays
Chapter 7 Trustee
Hays Financial Consulting, LLC
Suite 555
2964 Peachtree Road
Atlanta, GA 30305

John V. Ball
Humphries & King Realty
830 Glenwood Avenue
Suite 510-205
Atlanta, GA 30316

William A. Rountree
Rountree Leitman Klein & Geer, LLC
Century Plaza I, Suite 350
2987 Clairmont Road
Atlanta, GA 30329

Renasant Bank
c/o Shayna M. Steinfeld
Steinfeld & Steinfeld, P.C.
11B Lenox Pointe, NE
Atlanta, GA 30324

Terrence Griffin
1895 Milfield Circle
Snellville, GA 30078

Kimberly Griffin
1895 Milfield Circle
Snellville, GA 30078

This 19th day of February, 2023.

By: */s/ Neil C. Gordon*
    Neil C. Gordon
    Ga. Bar No. 302387
    Attorneys for Chapter 7 Trustee

02497467-1